Case number 22-1986, Jill Hile et al. versus State of Michigan et al. Argument is not to exceed 15 minutes per side. Mr. Bursch, you may proceed for the appellants. Good afternoon, your honors. John Bursch on behalf of the plaintiff appellants. I've reserved five minutes for rebuttal. May it please the court. Thank you, Mr. Bursch. If I could just interrupt for a second. Judge Strange is also participating as a judge on the panel today. She's not able to participate in the argument, but she will review the tapes for both counsel. Thank you, Judge Bursch. You may proceed. May it please the court. In 1970, religious minorities in Michigan, especially Catholics, participated in the political process and won. They obtained a modicum of public funding for private religious schools. The political majority responded not only by repealing that success, by making it more difficult for that minority to succeed in the future. As a result, religious families today are barred from lobbying the legislature and governor in Michigan for tuition help. Instead, they must undertake the onerous process of pursuing a constitutional amendment. The question is whether in doing so, Michigan reallocated political power to disadvantage a protected class. Now, the Michigan Supreme Court has already done much of the heavy lifting here. In Traverse City, that court determined that the amendment's impact was nearly entirely on Michigan religious schools and families, and in counsel against parochia, a slur against Catholic schools, the court held that the amendment was targeted to reverse that modest religious school appropriation. And so that leaves two issues for this court to resolve, framed by the district court opinion. First, whether political restructuring claims still exist after Schuette, and second, whether such claims apply to religious classes. The answer to both is yes. Can I stop you and just start with standing? Yes, please. So I understand your theory. The complaint alleges the harm of not having the funds from the 529 plans. And that has now been caused by the state law that is not really an issue now. And so it's kind of switched to the equal protection type idea, and not being able to participate on a level playing field. But even in all those cases, like the racial set-aside cases, there's been required, depending on the stage of the case that you're at, proof that the plaintiff is ready and able to participate in whatever activity the plaintiff is being unfairly discriminated against. I'm not certain that I saw much of any allegations with respect to these eight plaintiffs about what type of lobbying activities they would do. And I wonder whether that you plausibly stated an injury to kind of the speech components that you're advocating for now. Sure, and obviously that wasn't an argument that was raised in the district court. The district court judge didn't address that. And so we didn't have an opportunity to amend our pleadings if that would be necessary. But if you look at PACE, that's the organization, the parents who advocate for choice in education, they are a lobbying group and they go to the legislature on a regular basis and they ask for public funding for school choice, including private religious schools. So I don't think there's really any debate about that. Even in their briefing on appeal, I don't hear the state making that argument. Well, do you think it has to be specific? I mean, in a free speech case, I usually think you have to allege allegations. There has to be an eminence element to it. I wanna speak and something is depriving me. And there's just not a lot of specificity in the complaint. As far as I could tell, it was in the specific count more than anything, but there it was in an abstract level. Am I missing anything more specific? Well, abstract in the sense that they don't have the ability to do it now. If you almost think about this like a pre-enforcement case where you have a law that prohibits someone from speaking a certain message or otherwise they'll suffer recriminations like the 303 creative case that the Supreme Court just decided. Here, they can't even go to the legislature and advocate for something because if that bill were to be passed, it would immediately be struck down by the state courts under Michigan's Blaine Amendment. So there's a certain futility to lobbying today for a law that is facially invalid under Michigan's constitution as it stands. But certainly these plaintiffs, this organization and the individual plaintiffs are ready and willing to go forward and ask for that, including for an expansion of the 529 program. Now, we went back and forth on that in the trial court because the 529 plan documents suggest that it has been expanded in accordance with the federal government's expansion to allow monies to be spent to repay student loans and for trade schools that aren't at the college level and things like that. And then the state took a different position on that. Well, even things like that or getting private K through 12 tuition, we would be advocating for that tomorrow if that door was open to us and it's closed. And so I think the allegations in the final count addressing political restructuring go right to the heart of the activity that we want to engage in, but are prohibited from by this unconstitutional law. So turning to Schuette and whether it overruled Hunter, the answer has to be no. Only two of the eight justices, their opine political restructuring precedents should be overturned. The majority opinion and Justice Breyer's concurring opinion all affirmed their continuing vitality. And I know a little something about that case because I happened to argue it on behalf of the state of Michigan. And in the briefing, if you go back and look at it, we did not argue that a Hunter should be overturned. We did argue that Seattle should be overturned. And in going back and looking at Justice Harlan's concurrence in Hunter, you can see the simple common sense reason why the doctrine makes sense. He describes the world of political restructuring laws as coming in two classes. One is just the run of the mill stuff that says how big the legislature is going to be, what votes are required to pass a bill, how do you get the number of signatures to get on the ballot? But then he says, there's another class and I'll quote here, a law may quote, have the clear purpose of making it more difficult for racial and religious minorities to further their political aims. And when that happens, strict scrutiny applies. And it makes sense that the court would- It's not entirely clear to me what the test is after Schuette though. Schuette, certainly I agree with you, didn't overrule these cases. But, so Justice Scalia's concurrence said there's generally a two-part test that has to involve a racial issue and some law had to have been passed that affected the minority in a way that made it more difficult for them to increase their objectives. Do you think that same two-part test still applies even if we expanded it to religion? The first question is, does it involve, I guess you would say a religious issue? Well, yeah. So I think Justice Scalia was clearly right on the second part. On the first part, I think he erred in not including religion because Hunter mentions religious classes, Seattle mentions religious classes, Gordon B. Lance mentions religious classes. He said, it has to harm a racial minority. So how do you think of what qualifies as a religious, is it all religion or is it a particular religion that would qualify? I think it could be any religious minority or the class of religious minorities. And here's why that's true, Judge Murphy. The Constitution really only singles out two classes of people for special protection. One is racial minorities or those depending on national origin. And the other is religious minorities. And there's nothing in the Constitution that suggests that the 14th Amendment would treat religious minorities less well than racial or ethnic minorities. But there are a whole bunch of other provisions in the Constitution that deal with religion. And your advocacy here, your legal position could have pretty far reaching implications. The Michigan Constitution also has an establishment clause that says no ties to churches. If the Catholic Church said that we can't get ties  would they be able to state a claim under your view of the political process doctrine? So the equivalent- I'm sorry, if they can't get what because of the establishment clause? Ties, it's in the Michigan Constitution, Article 1, Section 4. So it's essentially the Michigan Establishment Clause. Why isn't it under your view, the Michigan Establishment Clause itself unconstitutional? Because it makes it more difficult for religious minorities to achieve their objectives. Because there's no evidence that it was done with that intent. That the narrowing factor in Hunter was that the minority group had achieved a success. And then the majority came back by taking that success away and then raising the bar so that they couldn't get it again as easily in the future. They now had to go to a referendum rather than to the city council. And that's a mirror image of what happened in Michigan. The religious minority had finally gotten a benefit to help pay for religious schools so that their taxes, which went to public schools could now be paid towards their own kids' religious education. And the minority came back or the majority came back not only by taking that away, but by raising the bar. And it's only in that unique circumstance, I think, where you have a political restructuring problem. But the precedents, all three of them are replete with the religious language. You literally have to erase words from those. And it makes sense that you would have them in there. Go back and think about Hunter. At the same time that black residents of Akron were being discriminated against in housing, so were Catholic and Jews by the Ku Klux Klan. That's specifically called out by the Hunter opinion. And so the majority in Hunter saw those religious minorities and the racial minorities as of a piece, that they were both benefited by the law that provided non-discrimination protection and that they were both harmed intentionally because of their status when that was not only taken away, but then the bar was raised for anti-discrimination laws in the region. Can I ask just one? Your time is running out. It's not entirely clear to me why you're... You have a lot of allegations, both in your complaint and your brief of intentional discrimination. When did that just violate... Why would you need the political process doctrine? Why wouldn't you be able to allege just a traditional equal protection violation with that type of intent allegations that presumably we have to accept as true at this stage? I'm just curious why not just... Look, if they're intentionally discriminating against a particular religion, that would either violate free exercise or at least equal protection. There's a mix of how those interrelate, but I don't know why you would need the political process that raises the level. Yeah, it's certainly a free exercise problem. Masterpiece Cakeshop says that when the government or the electorate acts with hostility then against religion, per se, because of religion, that that's a constitutional violation. And then in the very first footnote of the Coach Kennedy case, the Supreme Court then explains that if that hostility is present, then the law is immediately invalidated. So, you know, you don't need to go any further than that. And so certainly on a motion to dismiss, that would be enough to keep that free exercise claim alive. You know, we didn't focus it on in the briefing as much because with political restructuring, we don't have to prove animus, we just have to prove intent. An intent to take away a benefit and then to change the level of the political system where you get that benefit. And so in that sense, it's easier. But I think an alternative basis to reverse and remand would be to find taking all those allegations to be true that there was significant religious animus. I know the state will dispute it, but in the public record, it's virtually undisputed. The Michigan Supreme Court certainly recognized it. And that would be an independent reason for reversal. But on the political restructuring doctrine, if you conclude that Hunter is still good law and that you apply it as it says to religious minorities, then we're actually entitled to judgment as a matter of law and we don't even need to go back on remand. And so that's the clearest path. And I know my time is up, but maybe I can make just one closing comment on that. If I'm in your shoes, you know, the question I ask myself is, isn't this a big ask? You know, you want me to strike down a constitutional provision, a state constitutional provision that the majority of Michiganders supported. And what I would say is that it's more audacious for the state to ask that a law which violates Supreme Court precedent and the Equal Protection Clause to remain in place. In cases like Obergefell, Trinity Lutheran, Espinosa, the Supreme Court didn't hesitate to strike down even state constitutional amendments passed by vast majorities because they violated the constitution. And I was hoping Judge Strange would be on the panel. I appreciate Judge Bush that she'll participate because she was part of the en banc majority in the Schuette case. Now I lost Schuette before the en banc Sixth Circuit before I won it in the US Supreme Court. And she joined the majority opinion which used the exact same political restructuring theory here to strike down Michigan's constitutional amendment that prohibited the use of race or sex in public university admissions. So I don't think courts should be shy about applying the constitution. And when the US Supreme Court precedent has not been overruled, it should be applied. So unless you have any further questions. Thank you. Thank you, Judge Bush. Counsel for the state. Thank you, your honors. And may I please the court, Linus Banghart-Linn, Assistant Solicitor General for the state of Michigan on behalf of the state defendants, respectfully requesting that this court affirm the decision below. As you know from the briefing, I think we have two main reasons to affirm the decision. One is based on standing and based on the abandonment of three of the counts in the complaint and not being able to show any real injury. And the second is on the merits because the no aid clause does not violate the equal protection clause under a political process theory or any other theory. Turning first to the standing point, I think that the plaintiff's theory of standing here would really blow standing wide open when it comes to political process questions. The plaintiffs here want to lobby the state legislature to enact a policy that they would prefer that's different than the current policy. There are policies I would prefer that are different than the current policy that the legislature can't do anything about because of the Michigan constitution. And I think that's true for almost any Michigander. Do you disagree with my view of what the legal standard is, which is in the equal protection context, when someone is alleging some type of discrimination in some type of government program, all you have to do is say you are ready and able to participate in the program, but if you apply, you're gonna be treated differently and you're gonna be put at a disadvantage. In the racial set aside cases, those are the ones I'm thinking of. That was the test and that's what the court said was enough for standing. I guess I have a question. Do you agree that that is the same legal principle that should apply for this claim? And two, why wouldn't they meet it? Well, I think that that makes sense when you have a program, for example, if you look at the Hunter case and the Seattle case where they, in Hunter, there was a law that the plaintiff was trying to avail herself of and then there was a state law that barred that. So this one, the program that the plaintiffs wanna participate in is simply going to the legislature and asking for a different policy choice. And if that's true, I mean, that's a program that anybody can, and so I guess the question is, where would that stop? Who wouldn't have standing? If I don't like that the Michigan Constitution bars the death penalty, if I don't like that the Michigan Constitution bars a graduated income tax, if I don't like the policy on embryonic stem cell research, is the federal courtroom door open to me to ask you to tell the Michigan voters they were wrong to make these decisions in their constitution? And I think, no, I think the answer is that you have to show some injury. They alleged it in their complaint. It was based on a misunderstanding of Michigan law, and that's why we didn't argue standing on the same terms in the district court. We did argue standing on sort of a different theory because they were alleging, albeit incorrectly, they were alleging an injury, but now their injury is just, we want to change the law, and we can't, and it's- Why wouldn't, what if they had specific allegations that said, or if it was a school, suppose, a religious school that says, we want to lobby for the subsidies that are denied us. I don't, if they had concrete allegations of the steps they were gonna take to try to pass legislation, it's not obvious to me why that wouldn't show ready and able to participate in the activity. It's just the problem with the, it's not a problem, but the idea behind the political process doctrine is the thing that has denied me is the lower level government in which I can achieve my objectives, whether it's from city to state or from state to constitution. And so if the state barred me from lobbying my city to pass some ordinance, I think it would be enough to suggest with concrete allegations that I plan to do this, but even if I'm unsuccessful, there's no chance of, achieving my objective because of the state bar that is now a hurdle. I don't understand how else you would raise these type of claims, except through those allegations. Well, I think you raise them by alleging that you suffer some concrete injury from the current state of the law, like these plaintiffs did in their complaint, where they said, were it not for the no aid clause, right? We could spend our $529 on private religious schools and we would have tax advantages from doing that. And it's only the no aid clause that prevents us from doing that. That's an injury that they allege. Now, again, we disagree on whether that's true or not, but in terms of the allegation, that's a concrete injury. But I think the disagreement I have with what you're suggesting is that I don't see a limiting principle to where any plaintiff can simply say, I would like the policy of the state of Michigan to be X instead of Y, but the Michigan constitution makes that hard, means I can't go to the legislature. So I'm gonna file a federal lawsuit because federal judges know better than anyone else than the people of the state of Michigan what policies Michigan should have, strike it down, then let me go to the legislature. And then at that point, they can change the law to what I want. I don't think that's what the political process theory is for, and I just think that there's no limiting principle to that. Does that mean like, because I think in response to your hypo about what their current injury is, your response would be independent of the state constitutional provision. The state legislature has decided to exercise its policy objectives not to expand the 529 program. So that independently bars them on causation grounds. They have an injury, but it's not traced to the constitution. That suggests to me that the only conceivable way you could get standing is if you got the legislator's buy-in, I guess. You have to pass some law that would violate the constitution, and then you could show that it really was the constitution that was the cause of your injury. But then would that in some respects make this non-justiciable then? No, I don't think so. I think that is the situation that you had in Hunter and the situation you had in Seattle is you had a law that was on the books and then a higher law city charter was, right, there was an ordinance, which is akin to a statute, and then there was an amendment to the city charter, which is akin to a constitution that invalidated the ordinance. And then somebody seeking to avail themselves of the benefits of the ordinance was barred from doing that by the amendment to the city charter. Well, in Seattle, what was ironic about that, it was the city versus the state. Right, no, I think it was- So I don't know how it would play out here when it's the general, who's the general assembly gonna sue, the constitution or? I don't know. They wanna pass a law, but they can't because of the constitution. Well, I think that, respectfully, Judge, I'm seeing my time dwindle down and I haven't really come to the merits at all. So I'd like to shift gears if that's all right. And I'm relying on you for the rest of it. And I thank you. I appreciate Mr. Bursch's discussion about how similar this case is to Schutte in terms of wishing Judge Strange were here, who was on the other side in Schutte. I agree that this case, I think is similar in many respects to Schutte. And I think it should be decided the same way. I think that the choice of the Michigan people should be respected in the same way that the Supreme Court ordered it to be in Schutte. And I think that if you read, for one thing, if you read much of Schutte, I mean, most of that language, you could cut and paste and make only a couple changes and you've already written most of your opinion in this case. It is so similar. It is religion instead of race. That is something the district court relied on. And in the briefing in Schutte, the state did say that it had to be racial, but I tend to agree that that's, I understand the district court's reluctance to expand to this sort of dying doctrine. How do you, what's your view? I assume that you agree that the plurality didn't overrule the earlier. They didn't over, well, okay. How did they, how did they modify? It's not clear to me what the test should be. I wonder what, do you have a position on what the test should be after Schutte? I think the test after Schutte should be, well, first of all, it should require, I agree it should be race or religion. And I respectfully, I believe in our briefing, we did say it should be race. The district court did say that, but I think that opposing counsel's points are well taken that both of those are protected classes. But I do think that what you need is you need some race-based or religious-based creation of a sort of a novel structure, a novel political structure, which is what you had. I mean, I think Hunter is the best example of that. I think, let me take Seattle first because you can't, I don't think you can read Schutte. You won't find the words Seattle is overruled in there, but you can't read Schutte's discussion of Seattle and think that the Supreme Court thinks that that, that there's anything left of that. I really think that Schutte really, I think, tore Seattle up, and I think it's really not viable. Hunter is a little unique because what the state did in Hunter was to create this new, or sort of the city, rather, this new procedure that says basically, other ordinances can be passed along one way, but this particular type of ordinance with this particular subject matter, that we have a new procedure to do it. And what they didn't do is constitutionalize the policy preference, and that would have been just subject to a plain old equal protection challenge. Does this city charter provision or does this constitutional amendment violate equal protection? But instead, they created this process that says, well, we're not going to decide one way or another, but we are gonna make it very difficult. Now, what Michigan's done here is we have decided one way or the other. We have decided, we have made the policy decision, and it isn't a religious policy decision. So one way to read the plurality in Schutte is to have viewed the earlier cases as not requiring any type of animus or intent-based allegations. And the one thing Schutte is adding is you have to show really strong views of intent, like intent to discriminate against. In that case, it would be religious minorities, I suppose here it would be, or excuse me, racial minorities. I suppose here it would be racial, or excuse me, religious minorities. Do you think it's a problem for your side? If that's how I view Schutte, and if we're at the pleading stage, do you think it's a problem? Wouldn't we have to take the allegations of intent as true at the pleading stage? And then you can disprove them on summary judgment or when there's evidence. But at the pleading stage, I would think we'd have to take those claims as true. No, I think they at least have to be plausible allegations and they're not supported by anything. They're not supported by anything. I mean, you can look at the plaintiff's own sort of history that's laid out in the briefing. Not our, we don't have an alternative history we're laying out. And here's the history. 1870, many states, or the 1870s and the 19th century in general, right? Many states pass Blaine amendments. Michigan does not. 1920, they put a Blaine amendment on the ballot. Michigan says, no, thank you. 1924, they put a Blaine amendment on the ballot. Michigan says, no, thank you, right? And then in 1970, they pass a facially neutral with respect to religion. And they even leave an exception for transportation, which I don't understand why anti-Catholic bigots would say, well, we will pay for transportation, right? And they don't make the distinction, which at the time they probably thought was constitutionally permissible because many states had it. They don't make draw the line between Catholic and Protestant. That probably would have even been impermissible then or Christian and non-Christian or religious and non-religious, right? This was long before Espinoza, Trinity, Lutheran. They could have said religious, non-religious like many states did, and they didn't. They said public and non-public. And that's the line that they drew. It's a facially neutral line. And as we pointed out on a briefing, you can't look under the hood for animus, but even if you look under the hood, there isn't anything there. The plaintiffs have put this- What about looking beyond, I see looking under the hood for animus, but also just looking at the effect of the law in the world. I mean, is it relevant how many, what percentage of private schools are religious under this test? No, it's not. And the reason is because that disparity wasn't created by the state itself. And so you have, the voters don't want, the voters want public- Let's assume you had a situation where every private school was religious and the law said, no, you know, nothing goes to private schools. Would that present a problem if every school, as a matter of fact, were religious, every private school? No, that would not present a problem. The only way that would present a problem is if Michigan had some law that said private schools have to be religious, right? Which would be unconstitutional, but for other reasons. But then in that case, having then created that discrepancy and then said, well, and also we won't fund private schools, that's Michigan saying we won't fund religious schools. That would present a difficult question. But instead, Espinosa says, Carson says, states are not required to fund private schools. And that's what Michigan chose is not to fund private schools. Now, the fact that at the time the Michigan voters made that choice, the fact that the majority of schools were Christian schools and Catholic schools, Catholic schools and other Christian schools, is not the fault of the Michigan voters or not based on any decision made by the Michigan voters. That was simply the facts on the ground. And so without any evidence of any other anti-Catholic animus at the time, and again, with my dwindling time, I do wanna point out the plaintiff's laundry list in the briefing of sort of here, what people in the public were saying at the time in 1970, virtually none of it is anti-Catholic. And the idea, you have to accept, in order to accept this, you have to accept the idea that if I don't want tax dollars to go somewhere, that means I hate that thing. And that's not true. You can be Catholic, you can be pro-Catholic, and you can still believe that tax dollars shouldn't go to the Catholic church, just like anything else. It's not hating something to think tax dollars shouldn't subsidize it. So for all of these reasons, I respectfully request that the court affirm, and I'd be glad to answer any of the questions that the panel might have. Thank you. Thank you very much. Mr. Bursch? Yeah, I'd like to start with Schutte and how to distinguish that case from this one, because you can do it in two different ways. One, the way the plurality distinguishes Schutte from Hunter, and one, the way that Justice Breyer does. So Justice Breyer, in his concurrence, says that in Hunter and Seattle, minorities had participated in the political process in one, the majority's subsequent reordering of the process repealed that success and made it more difficult for them to succeed in the future, diminishing the minority's ability to participate meaningfully in the electoral process. That's exactly what happened here. So then he distinguishes the Schutte case because there, the use of race in admissions was being done not by elected officials, not at the state or the local level, but by unelected administrators. And he saw that as being a different kettle of fish entirely than Hunter or Seattle. And so he wouldn't say that Hunter and Seattle are still good law and would apply in a case like this. The plurality, I think, Judge Murphy, you're absolutely right. They would look more to the intent of the electorate. And it's kind of laughable for opposing counsel to say at a 12B6 stage that there's not evidence of animus towards the Catholics who made up 98% of the private religious school students at that point. When you have so much public invective in campaign materials and letters to the editor, talking about money going to the Catholic church and how we shouldn't allow that to happen and how the Pope is going to take over the schools. The public officials in Michigan recognized that this was one of the most anti-Catholic political campaigns that they had ever seen. So what do you do with this? What do you do with our case law? I thought our case law, maybe the Supreme Court hasn't reached this principle, but the Sixth Circuit case law suggests that you're not for constitutional referenda supposed to look at kind of intent because it's impossible when you're talking about millions of citizens. So how would you respond to that, that it's just an impossible exercise? Well, I would say first, that's kind of what happened in Schuette. Second, I would say in City of Cuyahoga Falls, we discussed that at page 19 of our reply brief, that the court does talk about public statements constituting relevant evidence of the body politics discriminatory intent. And third, where that principle comes from, the Arthur versus City of Toledo case, that the state cites, that case involved just a repeal of a policy, not a political restructuring. And so Arthur recognized that Hunter in Seattle did not apply because of that fact. So the ordinances at issue in Hunter, the law at issue in Seattle School District wouldn't have passed Arthur's test because both of those laws too were facially neutral. And if you just said, well, I can't take the temperature of the body politic, then that's the end of the story. But in both those cases, the court looked past that and said, no, it's obvious what the intent was. It was to repeal the benefit that the minority had obtained through the democratic process, and then to put it out of reach so that they couldn't get it next time. And that's the type of discriminatory intent that the Supreme Court recognizes in this whole line of cases as being entirely valid for courts to look into. And here's why you need something like that. Say that you had a state with a historically black college, and for the very first time in their history, they lobbied the legislature and the governor, and they obtained a modicum of public funding, just like the Michigan religious schools did. And in response to that, the white electorate came back and passed a statewide referendum that not only repealed the black college funding, but said that in the future for black colleges to get public funding, they would have to go to a statewide referendum instead of to the legislature. And I think we would all acknowledge that that was intentionally racial discrimination. It reallocated the political process and squarely fits within Hunter. And this case does too. And as far as the door opening point, it's important to remember that Hunter and Seattle limit the plaintiffs to those who have been discriminated against because they are in religious or racial or ethnic minority classes. So when you're talking about STEM cells and a graduated income tax, it's not clear to me what constitutionally protected minority group is having their ox be bored in that situation. It would only happen in a situation like this. And Judge Murphy, you're absolutely right. If a claim like this can't get in the door because of standing, then religious minorities who are discriminated against won't ever have that opportunity because the legislature will just say no to whatever proposal that they're coming forward with. And then the defense in court will be, well, you can't base it on the constitution because you don't have standing to pursue a constitutional claim. And you can't sue us because it's the constitution that's causing the harm, not us. The fact is that this group Pace and these parents, they were actively involved in a recent- I would say this is a unique theory of standing. In Hunter, I believe it was a woman who had been discriminated against by private actors. And so she alleged that as her injury. And in Seattle, obviously it was the city itself. And in Schuette, I believe it was folks who were gonna benefit from affirmative action. So I guess it was more traditional than just this kind of air of harmed in lobbying the government to achieve your objectives. Do you have any cases that suggest that that is a type of injury that suffices? Like I said earlier, I think the pre-enforcement line of cases, including 303 Creative are the best fit where there's a law in place and you don't wanna violate it, but you can't do anything about it and sue. One thing I would suggest, I don't think it's necessary, but if the court wanted to remand for the limited purpose of allowing us to make those allegations while retaining jurisdiction, then you can come back and decide this case. What I can tell you is that Pace was active in the signature gathering process in the most recent cycle to put on the ballot a measure that would have expanded public school choice to private religious schools in Michigan. And that law too would have been struck down immediately. They had a concrete interest in pursuing that. As a result of the election, they don't have a legislature that's gonna adopt that and create the constitutional conflict, but it's certainly not the fault of the plaintiffs that they can't even get in the front door of the legislature to create the kind of pseudo concrete injury that my friend on the other side is talking about. Clearly the injury that Hunter and Seattle and Schuette itself identify is an inability to go to your representative and ask for something. And that door is closed to our plaintiffs. They wanna do that, they can't do it. And that's the kind of concrete injury that this doctrine protects against. Okay, well, thank you, counsel. We will take the case under submission and the clerk may adjourn the court. Thank you. This honorable court is now adjourned.